UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __12/20/2024__

DESARROLLADORA LA RIBERA, S. DE R.L. DE C.V.,

Plaintiff,

-against-

STEVE ANDERSON, et al.,

Defendants.

24-CV-67 (LAK) (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Desarrolladora La Ribera, S. de R.L. de C.V. (DLR) is the developer of Costa Palmas, a luxury residential community in Mexico catering largely to wealthy Americans. In 2018 and 2020, limited liability companies (LLCs) controlled by defendants Steve Anderson and Amit Raizada, respectively, purchased lots and commissioned bespoke homes in Costa Palmas. Both projects were significantly delayed, and the cost to complete the Raizada home kept climbing. Additionally, both purchasers objected to what they saw as strong-arm tactics by DLR and its affiliates to keep them paying despite the delays. Beginning in 2022, the purchasers brought a series of legal proceedings against DLR, its affiliates, and their personnel, including an arbitration before the International Chamber of Commerce (ICC) in Mexico (the Mexican Arbitration), criminal complaints filed with Mexican authorities, and civil actions in the United States alleging – among other things – fraud and extortion. In 2023, Anderson and Raizada retained a New York-based public relations firm, 5W Public Relations LLC (5W PR), which worked to place articles characterizing Costa Palmas as a "Ponzi scheme," identifying Anderson and Raizada as "two buyers injured by the scheme," and highlighting the fraud allegations made in their lawsuits.

Invoking the Court's diversity jurisdiction, DLR filed this action on January 4, 2024, alleging that Anderson, Raizada, and 5W PR "intentionally harmed DLR" through a "campaign of

defamatory and disparaging statements." Compl. (Dkt. 1) ¶ 1. On March 11, 2024, Anderson and 5W PR moved to dismiss the claims against them for lack of personal jurisdiction (Anderson) and failure to state a claim upon which relief can be granted (both moving defendants). (Dkts. 39, 41.) Separately, Anderson moved to compel arbitration and stay the case (Dkt. 43), relying on the broad arbitration clause contained in the underlying contracts between DLR and his LLC, known as GS 1975 LLC (GS 1975).

On April 15, 2024, plaintiff filed its Amended Complaint, again alleging that Anderson, Raizada, and 5W PR spread "deliberately fabricated falsehoods" about DLR, its affiliates, and their executives, which negatively impacted plaintiff's reputation and business. Am. Compl. (Dkt. 52) ¶¶ 1, 4-6. On May 3, 2024, defendant Raizada answered and (together with his LLC, known as TRG CP LLC (TRG)) counterclaimed, alleging fraud, interference with contractual rights, and violation of New York's anti-SLAPP statute. (Dkt. 64.) On June 5, 2024, Anderson and 5W PR renewed their motions to dismiss. (Dkts. 71, 74.) Finally, on July 8, 2024, plaintiff moved to compel arbitration of the fraud and contract-based counterclaims filed by Raizada and TRG and to dismiss their anti-SLAPP counterclaim. (Dkt. 76.)

On January 22, 2024, the Hon. Lewis A. Kaplan, United States District Judge, referred the case to me for pretrial management and report and recommendation on dispositive motions. (Dkt. 22.) For the reasons that follow, both motions to compel arbitration will be granted, and the remainder of the case will be stayed pending the arbitration proceedings.[1]

---

[1] Motions to compel arbitration and for related relief are within the authority of a Magistrate Judge to "hear and determine" pursuant to 28 U.S.C. § 636(b)(1)(A) and Fed. R. Civ. P. 72(a), subject to "clear error" review if a timely objection is filed with the District Judge. *See*, *e.g.*, *Legal Recovery Assocs. LLC v. Brenes L. Grp., P.C.*, 2023 WL 1382134, at *1 n.2 (S.D.N.Y. Jan. 31, 2023) (collecting cases).

I.      **BACKGROUND**

     A.      **Facts**

          1.      **DLR and Affiliates**

Plaintiff DLR is a Mexican corporation headquartered in Baja California Sur, Mexico. Am. Compl. ¶ 8. Together with its American affiliates, including Martell Capital Group LLC d/b/a Irongate (Irongate), DLR is developing Costa Palmas, which it describes as "a Four Seasons-branded and Aman Resorts-branded, luxury private residential development" in La Ribera, Baja California Sur. *Id*. ¶¶ 2, 29, 34. Jason Grosfeld is the CEO of Irongate and the "Legal Representative" of DLR. *Id*. ¶¶ 33, 45. Grosfeld can "do all legal acts on behalf of DLR." *Id*. ¶ 33.

          2.      **Steve Anderson and GS 1975 LLC**

Defendant Anderson is a resident of Wyoming, *see* Am. Compl. ¶ 9, and the "principal and managing member" of GS 1975, a Delaware LLC. Anderson Decl. (Dkt. 44-1) ¶ 2. On April 19, 2018, GS 1975 (as Buyer) and DLR, "including its successors, affiliates, or assigns" (as Seller) entered into a "Promise to Purchase and Sale Agreement" (GS 1975 PSA) for a property described as Casita-1, to be built at Costa Palmas for $16 million, payable in five installments as construction progressed. *See* GS 1975 PSA (Dkt. 44-2) at 1 & ¶ 2. Anderson signed the contract for the Buyer. *Id.* at 23. Grosfeld signed for the Seller. *Id.* As relevant here, the GS 1975 PSA states:

> Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be determined by arbitration administered by the International Chamber of Commerce Mexico ("ICC") in accordance with its Arbitration Rules. Either party may initiate arbitration by giving the other party a written notice of intent ("Notice of Intent"), in according to the herein established [sic]. . . . The place of arbitration shall be Los Cabos, BCS, Mexico. The governing law of the Agreement and of the arbitration shall be the applicable Mexican laws. . . . The procedures specified in this Section shall be the sole and exclusive procedures for resolution of disputes arising in connection with this Agreement.

GS 1975 PSA ¶ 51.

An amendment to the GS 1975 PSA, also dated April 19, 2018 (Amendment) (Dkt. 44-3), lowered the purchase price for Casita-1 to $10,500,000; set June 9, 2019, as the date for the "estimated Substantial Completion . . . of the Unit"; and provided that "[a]ny dispute relative to this Amendment or any controversy or claim arising out of or relating to this Amendment, or any breach thereof, shall be resolved in accordance with the Arbitration provisions of the [GS 1975] PSA." Amendment ¶¶ 2, 8, 27.

Due to what plaintiff describes as "unforeseeable obstacles," the construction of Casita-1 was significantly delayed. Am. Compl. ¶ 40. A Notice of Substantial Completion was finally provided on September 6, 2022, which "triggered Anderson's obligation to fund the fourth deposit" in the amount of $1,575,000 and conduct a "Punch List inspection" within 15 days. *Id*. ¶ 42. Anderson paid the fourth deposit and conducted the inspection, but then "posted a TikTok video" of the inspection, "casting DLR, Costa Palmas, and Irongate in a disparaging light." *Id*. ¶ 43. DLR retracted the Notice of Substantial Completion and offered to return the fourth deposit, but Anderson did not respond to DLR's offer, and DLR escrowed the funds. *Id*.

Thereafter, Anderson "commenced a series of civil and criminal complaints in Mexico against DLR, its affiliates, and its officers[.]" Am. Compl. ¶ 44. First, on January 12, 2023, GS 1975 commenced the Mexican Arbitration against DLR "to vindicate its rights under the PSA." Anderson Decl. ¶ 4. Next, on March 17, 2023, GS 1975 filed an action in California (the California State Court Action) against Grosfeld, Irgonate, Irongate officer Michael Radovan, Irongate affiliate JG Martell Group LLC, and Costa Palmas Beach and Yacht Club LLC (Beach Club LLC). Am. Compl. ¶ 45.[2] In that forum, GS 1975 alleged, among other things, that Grosfeld and his co-

---

[2] Beach Club LLC operated the Costa Palmas Beach and Yacht Club (Beach Club), a "private, members-only club" that was located within Costa Palmas. GS 1975 PSA ¶ 12(h). Ownership of a home in Costa Palmas did not guarantee membership in the Beach Club. *Id*.

defendants fraudulently induced it to purchase Casita-1 by making a series of false representations and promises (including assurances that the home would be completed "in short order," and in no event later than June 2019), and then "doubled-down on their fraud" by sending a sham Notice of Substantial Completion when the home was still "patently uninhabitable." *See* First Am. Compl. (Cal. State FAC) ¶¶ 1-4, 28-33, 38-42, *GS 1975 LLC v. Grosfeld*, No. 23 STCV 06016 (Cal. Super. Ct., Los Angeles Cnty., May 3, 2023) (hereafter "*GS 1975 v. Grosfeld*").[3] When GS 1975 attempted to protect its rights – by initiating litigation – Irongate retaliated by directing Beach Club LLC to cancel Anderson's membership in the Beach Club, which was valuable "not only for the access and experiences it provides, but also because the membership is transferable to a subsequent purchaser . . . and thus greatly increases the resale value of the residences." *Id.* ¶¶ 6, 47-49. GS 1975 further alleged that "these unfair and misleading business tactics are standard operating procedure for Defendants," that many other Costa Palmas owners were similarly victimized, and that Mexican authorities were conducting a "criminal fraud investigation." *Id.* ¶ 5. GS 1975 asserted six causes of action: (1) fraudulent misrepresentation; (2) negligent misrepresentation; (3) breach of contract; (4) breach of the covenant of good faith and fair dealing; (5) intentional interference with contractual relations; and (6) violation of Cal. Bus. & Prof. Code § 17200. *See* Cal. State FAC ¶¶ 53-95.

On June 16, 2023, defendants in the California State Court Action moved to compel arbitration and stay proceedings – relying on the broad arbitration clause in the GS 1975 PSA –

---

[3] The Court takes judicial notice of the existence and contents of the California State Court Action filings discussed herein – as well as the filings in other jurisdictions discussed in Part I(A)(3), *infra* – pursuant to Fed. R. Civ. P. 201(b)(2). The Court makes no assumption as to the truth of the matters discussed in those documents. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

and on July 19, 2023, the court granted the motion and stayed the case "pending binding arbitration as to the entire action." Minute Order, *GS 1975 v. Grosfeld* (July 19, 2023); *see also* Am. Compl. ¶ 46. ("Irongate obtained a stay of Anderson's California Action and all matters were compelled to the Mexican arbitration proceedings."). Thereafter, the parties to the California State Court Action stipulated to the jurisdiction of the Mexican arbitration tribunal over "the claims asserted in the [Cal. State] FAC." Stipulation, *GS 1975 v. Grosfeld* (March 21, 2024).

On August 2, 2023, Anderson himself filed a criminal complaint in Mexico against DLR, Irongate, and a dozen individual Irongate officers and employees, including Grosfeld, "alleging criminal fraud." Am. Compl. ¶ 52. According to DLR, "the prosecutor [has] declined to open an investigation or file formal charges," *id*. ¶ 53, and "[n]o criminal legal proceedings have been brought against DLR or its affiliates by Mexican or American officials." *Id*. ¶ 102. According to Raizada and TRG, however, "prosecutors in Mexico are investigating DLR/Irongate's wrongful conduct in Costa Palmas," "subpoenas have been issued to certain DLR representatives as part of those proceedings," and Anderson "has been contacted by Mexican prosecutors" in connection with his criminal complaint and is "working with" those prosecutors. Raizada/TRG Counterclaims (Countercl.) (Dkt. 64 at ECF pp. 49-72) ¶¶ 26, 106(b)(ii)-(iv).[4]

Meanwhile, on March 21, 2023, DLR issued a new Substantial Completion Notice for Casita-1, which "established a closing date of May 5, 2023," and "triggered Anderson's payment of the fifth and final deposit due on May 5, 2023[.]" Am. Compl. ¶ 47. Anderson again conducted a punch list inspection, after which he compiled a list of "allegedly deficient and/or imperfect items

---

[4] Raizada further alleges that he "has been contacted by special agents with Homeland Security Investigations" and "is cooperating with those and other federal authorities" in the United States to investigate DLR and its affiliates. Countercl. ¶ 106(b)(vi). DLR states that there is "no basis" for this statement, and that the alleged American investigations "do not exist." Am. Compl. ¶ 104.

to be addressed by DLR." *Id.* ¶ 48. On May 18, 2023, Anderson belatedly paid the final deposit, but "refused to take any of the additional steps required to consummate the closing of [Casita-1] as set forth in the [GS 1975] PSA, including, but not limited to, forming the required Mexican trust and obtaining closing certificates." *Id.* ¶ 50.

On May 23, 2023, DLR terminated the GS 1975 PSA and returned the final deposit, but retained Anderson's previous deposits of approximately $6.8 million. Am. Compl. ¶ 51. DLR alleges that it is entitled to keep the previous deposits "as liquidated damages as expressly allowed under the PSA." *Id.*[5]

### 3.    Raizada and TRG

Defendant and counterclaimant Raizada is a resident of Florida. Am. Compl. ¶ 10. Counterclaimant TRG is a Florida LLC, and a citizen of Florida, South Dakota, and Missouri for diversity purposes. (*See* Dkt. 90.) On April 1, 2020, TRG (as Buyer) and DLR, "including its successors, affiliates, or assigns" (as Seller) entered into a "Promise to Purchase and Sale Agreement" (the TRG PSA) (Dkt. 78-3) for a property described as Oceanview Villa Lot 25, at that time a vacant lot, for a purchase price of $4,250,000. TRG PSA at 1 & ¶ 2. Raizada signed the contract for the Buyer, as its Manager. Grosfeld signed for the Seller. *Id.* at 28. On April 2, 2020, TRG and DLR's affiliate Administradora De Desarrollos Costa Palmas, S.A. De C.V. (CP Home) entered into an "Agreement for Project Management Services for Design and Construction (Cost Plus Fee)" (the Construction Agreement) (Dkt. 78-1) for the construction of a residence on Lot 25 on a cost-plus basis. *See* Am. Compl. ¶ 55; Const. Ag. at 1. The contract gave the "Buyers" an

---

[5] *See* GS 1975 PSA ¶ 28(iii)-(iv) (if Buyer defaults, including by "fail[ing] to take or caus[ing] to be taken any action to be taken by or on behalf of Buyer to cause Closing to be completed on the Closing Date," Seller may, among other things, "terminate this Agreement and enter into and recover possession of the Unit" and "retain the Deposits paid as of the date of Buyer's default as liquidated damages with respect to Buyer's default").

option to "convert this Agreement to a 'fixed price' construction contract," exercisable after CP Home provided them with "the Budget." Const. Ag. ¶ 3.1.4.

The TRG PSA and the Construction Agreement both contain the same arbitration clause, using the same language, as the GS 1975 PSA. *See* TRG PSA ¶ 47; Const. Ag. § 7.1. The Construction Agreement also provides:

> By agreeing to arbitration as the method for final resolution of disputes, Buyers and CP Home acknowledge and agree that they shall not engage in litigation to resolve their disputes, except to confirm as a judgment the decision and award resulting from arbitration; that they waive their respective rights to trial by jury; and that they waive their respective rights to appeal from the arbitration decision and award.

Const. Ag. § 7.2.

The construction on Lot 25 did not go smoothly. Plaintiff concedes that the project "faced some delays and budget increases," but alleges that Raizada made things worse by "refusing to approve updated construction budgets, causing further delays to the construction." Am. Compl. ¶¶ 56-57. Counterclaimants, for their part, charge that "Irongate and its affiliates refused to honor [their] fixed construction price of $5,974,809," began "sending new construction budgets" with higher costs, and demanded that TRG pay more money before they "would do any work on the home." Countercl. ¶¶ 39(f), 41. By March 2022, Raizada and his LLC had paid "more than $4,500,000," supposedly for construction materials, labor, and other costs for the villa, but "the only work actually performed" was "dirt work and the concrete superstructure." *Id*. ¶ 40. In Raizada's view, Irongate and its affiliates must have "diverted their resources, materials and labor to the design and construction of DLR's homes or other homes in Costa Palmas." *Id*. ¶ 39(e).

Raizada threatened to sue. Countercl. ¶ 42. Irongate then threatened to "keep all of Counterclaim Plaintiffs' money, hold the house hostage, and terminate [Raizada's] Beach Club membership unless Counterclaim Plaintiffs signed an Estoppel Certificate." *Id*. On July 7, 2022,

Raizada signed the Estoppel Certificate, on behalf of himself and TRG, affirming that TRG elected *not* to convert the Construction Agreement into a fixed price contract; acknowledging that the current estimated cost of completing the home was $7,217,515; and agreeing that the Buyer would pay those costs (with certain exceptions for previously disputed fees). Am. Compl. ¶ 58; *see also* Estoppel Cert. (Dkt. 78-2) ¶¶ 2-4.[6] Additionally, both Raizada and TRG bound themselves to paragraph 6 of the Estoppel Certificate, as follows:

> 6.      Buyer, on behalf of itself and its affiliates, hereby agrees, warrants, and covenants that any disputes between CP Home and its affiliates arising out of or in connection with the [Construction] Agreement will be resolved solely and exclusively pursuant to the arbitration provisions set forth in the Agreement. For avoidance of doubt, Buyer expressly warrants and covenants that Buyer will not institute or prosecute legal proceedings in any forum within the United States against CP Home or its affiliates, including but not limited to [Irongate], to recover any damages, equitable relief, or any other type of relief in connection with any claims that Buyer has or may have arising out of or in connection with the Agreement.

Estoppel Cert. ¶ 6.

On October 7, 2022, Irongate's Managing Director of Development, David Waller, sent Raizada and TRG "a construction budget for $10,781,082 ($3.5 million more than the budget attached to the Estoppel Certificate and almost twice the fixed price)," and on October 19, 2022, Waller sent an email "stating that no work would be done unless Counterclaim Plaintiffs accepted the new $11,000,000 budget[.]" Countercl. ¶¶ 48-49.

On January 17, 2023, TRG filed a case in the Central District of California (the Central District Action) against Irongate, Waller, Irongate officer Mitch Laufer, and Beach Club LLC.

---

[6] The Certificate did not guarantee that construction costs would not rise again. *See* Estoppel Cert. ¶ 3 ("Buyer acknowledges and agrees that the Estimated Costs are an estimate only, and that Construction Costs may increase or decrease based on costs actually and reasonably incurred (with no markups or contingencies) in construction of the Project as set forth in Section 3.1.2 of the [Construction Agreement].").

Am. Compl. ¶ 59; Riley Decl. (Dkt. 78) ¶¶ 6-8. In its Amended Complaint, filed on January 31, 2023, TRG alleged, among other things, that the "Irongate Defendants" (all defendants except Beach Club LLC) "fraudulently induced and wrongfully threatened Plaintiff, both verbally and in writing, to force Plaintiffs [sic] to pay monies to the Irongate Defendants and/or their Mexican affiliates, sign purported agreements, and give up other valuable rights and property to which they are not entitled. The Irongate Defendants then tortiously interfered with Plaintiff's contract with the Beach Club [LLC] and induced or caused the Beach Club [LLC] to breach its [membership] contract with Plaintiff and violate [its] covenant of good faith and fair dealing to Plaintiff arising from that contract." *See* Riley Decl. Ex. 5 (Dkt. 78-5) (C.D. Cal. Amend. Compl.) ¶ 3. TRG asserted ten causes of action: (1) intentional fraud; (2) promissory fraud; (3) fraudulent concealment; (4) constructive fraud; (5) extortion; (6) attempted extortion by threatening letter (in violation of Cal. Penal Code § 523); (7) tortious interference with contract; (8) breach of contract; (9) breach of the covenant of good faith and fair dealing; and (10) civil conspiracy. *Id*. ¶¶ 63-157. Additionally, on February 7, 2024, Raizada and TRG filed an action in Delaware Superior Court (the Delaware Action) against Beach Club LLC for breach of contract and breach of the covenant of good faith and fair dealing. Riley Decl. Ex. 7 (Dkt. 78-7) ¶¶ 24-42.

On April 3, 2023, defendants in the Central District Action moved to dismiss the case on forum non conveniens grounds or, alternatively, to stay the case pending arbitration in Mexico. On March 29, 2024, the court granted the requested stay, holding that "the plain language of the Estoppel Certificate clearly evinces the parties' intent to have all relevant disputes between CP Home and its affiliates, including Irongate, to be resolved by arbitration," and that TRG's attempt to "contest[] the validity of the Estoppel Agreement" itself did not change that result, as "the arbitrator must consider its validity in the first instance." *TRG CP, LLC v. Martell Cap. Grp., LLC*,

2024 WL 2229964, at *4 (C.D. Cal. Mar. 29, 2024).[7] Following the stay of the Central District Action, the parties to the Delaware Action agreed to stay that case as well. Riley Decl. ¶¶ 10-11.

### 4.    5W PR and the Public Relations Campaign

Plaintiff alleges that Anderson and Raizada, "not content with letting the legal process run its course," contracted with 5W PR for the purpose of defaming DLR and Costa Palmas. *Id.* ¶ 61.[8] Specifically, Anderson and Raizada "provided deliberately fabricated information" to 5W PR, which either knew the information was false or recklessly disregarded its truth or falsity, but nonetheless relied on it to publish defamatory content in various online magazines and on websites. *Id.* ¶¶ 62-70.

As proof of 5W PR's involvement, plaintiff points to a December 18, 2023 email from Haley Garvin at 5W PR to Jim Dobson at *The Luxeworld*, a luxury travel website. Garvin describes Costa Palmas as an "alleged multimillion-dollar Ponzi scheme that combines mafia-like tactics, resulting in massive fraud accusations," which has "prominent investors calling LA-based Irongate and CEO Jason Grosfeld real estate's Bernie Madoff." Am. Compl. Ex. A (Dkt. 52-1). Garvin refers to Raizada and Anderson as "two buyers hurt by the scheme" and writes that "[d]espite Irongate repeatedly assuring that the property was being worked on, evidence shows a very different picture. After the buyers kept inquiring about the status of their homes, Irongate retaliated and extorted them." Garvin notes that Anderson and Raizada "filed a lawsuit" and asks whether *Luxeworld* would be interested in learning more about their lawsuit and the "scheme." *Id.*

---

[7] Given the breadth of the arbitration clause in the Estoppel Certificate, the court found that all of TRG's claims "must be sent to arbitration" except the attempted extortion claim under Cal. Penal Code § 523, which "arises uniquely from California law and thus cannot be arbitrated under Mexican law." *TRG v. Martell Cap. Grp.*, 2024 WL 2229964, at *4-5.

[8] 5W PR is a New York LLC, Am. Compl. ¶ 11, and is wholly owned by a New York domiciliary, making it a citizen of New York for diversity purposes. (*See* Dkt. 91.)

Insofar as the record reflects, 5W PR did not succeed in placing an article in *The Luxeworld*. However, plaintiff attaches eight "Defamatory Articles," dated from August 23, 2023 to January 5, 2024, *see* Am. Compl. Exs. B-I (Dkts. 52-2 through 52-9) which sound similar themes, using similar language, and which plaintiff attributes to the "joint efforts" of Anderson, Raizada, and 5W PR. Am. Compl. ¶ 63. The Defamatory Articles are as follows:

Ex. B: Jordan French, "Is Jason Grosfeld's Costa Palmas Resort the New Madoff Scheme?" *GritDaily* (Aug. 23, 2023). French reports that "[s]ome homeowners in Costa Palmas . . . accuse Irongate of being a present-day Bernie Madoff, using the millions of dollars that it receives for luxury homes in a loosely structured Ponzi scheme to take or divert money from home buyers for Irongate's own personal profit." The article reports that "two homebuyers" in Costa Palmas have filed lawsuits, describes the allegations made in the California State Action and Central District Action; and wonders whether they are "only the tip of the iceberg." Additionally, French reports, "sources say that civil and criminal legal proceedings have been brought or are being initiated against Irongate and its Mexican subsidiaries in Mexico, for fraud, racketeering, extortion, conspiracy and other wrongful conduct."

Ex. C: Mike Austin, "Is Jason Grosfeld's Costa Palmas Resort the Newest Ponzi Scheme?" *Medium* (Sept. 8, 2024). Austin writes that "[m]any Costa Palmas locals" charge Irongate with "being a modern-day Bernie Madoff, using the millions of euros it receives for luxury homes in a loosely orchestrated Ponzi scheme to steal or divert money from home buyers for Iron Gate's own personal gain." Austin describes the California State Court Action and the Central District Action, noting the allegations that Iron Gate "used the owners' funds and/or supplies for other purposes or to build other homes." He adds, "[W]e've been told that both Mexican and American federal officials are looking at this issue."

Ex. D: Tom White, "Jason Grosfeld sells a bill of goods at Costa Palmas," *Law and Crime* (Jan. 4, 2024). White reports that "[f]or some buyers in Costa Palmas, including Steve Anderson and Amit Raizada, Grosfeld and his company Irongate made empty promises and sold them a bill of goods." White then describes the allegations made by Anderson and Raizada concerning their own experiences in detail, quotes Raizada as saying that the executives he dealt with at Irongate "have no moral compass and will do whatever it takes to put money in Grosfeld's pocket," and reports that both Anderson and Raizada are "cooperating with Mexican and United States law enforcement agencies in ongoing investigations into these matters."

Ex. E:   "Jason Grosfeld's Irongate, Costa Palmas: Fraud and Donald Trump Ties," *99 Consumer* (Aug. 31, 2023). *99 Consumer* reports that "[o]ff the record homeowners" at Costa Palmas "claim that Irongate has developed a strategy to defraud, steal from, and extort millions from buyers with impunity and that Irongate has implemented that strategy in Costa Palmas[.]" The article includes sections headlined "Fraudulent Practices by Jason Grosfeld," "Victims Speak Out Against Irongate's Deceptive Tactics," and "Potential Criminal Investigations Against Jason Grosfeld." Under "Potential Criminal Investigations," the article reports: "sources say that criminal investigations are underway in the United States and Mexico and may result in charges."

Ex. F:   "Costa Palmas – Taking from the Rich and Giving to Jason Grosfeld," *Bust* (Nov. 9, 2023). In an article devoted primarily to describing the allegations made in the lawsuits filed by GS 1975 and TRG, *Bust* comments "it appears that Grosfeld has orchestrated a scheme to take money from the wealthy," but rather than "give that money to the poor, Irongate allegedly pocket[ed] it[.]" The article reports that both Anderson and Raizada are "cooperating in criminal investigations" of Irongate and its affiliates.

Ex. G:   Mike Austin, "The Latest Ponzi Scheme of Jason Grosfeld," https://latestnewz.hashnode.dev/jason-grosfeld (Nov. 21, 2023). In this blog post, Austin reports that "criminal and civil cases have been brought against Irongate and Mexican Affiliate agencies within Mexico for racketeering, conspiracy, or fraud charges or are on nearing being filed." After describing the civil litigation brought by GS 1975 and TRG, Austin states (somewhat incoherently) that "the majority of Costa Palmas residents price Irongate as a reincarnation of Bernie Madoff and use the millions of euros it earns to purchase luxury homes through fraud Ponzi schemes to extort money from buyers of homes to make profits from Irongate."

Ex. H:   "Is the Costa Palmas Resort Owned By Jason Grosfeld The Next Ponzi Scheme?" *Shops4Now* (Dec. 13, 2023). According to *Shops4Now*, "Costa Palmas residents are quick to say the existence of Iron Gate, a modern-day Bernie Madoff, is using millions of euros made from luxury properties to trick customers into increasing profits by taking funds in the name of Iron Gate." The article goes on to report (even more incoherently) that "Iron Gate, its Mexican subsidiaries, as well as representatives of its affiliates have brought civil and criminal instances throughout Mexico to Iron Gate in connection with conspiracy and fraud racketeering and also extravagant and other crimes."

Ex. I:   "Jason Grosfeld, Irongate, Costa Palmas Fraud Alert!" *99 Consumer* (Jan. 5. 2024). This article appears to be substantially identical to the *99 Consumer* article at Ex. E.

Although none of the articles identifies DLR by name, plaintiff alleges that they contain "false and misleading statements that were purposefully designed to leave the impression that DLR is operating (or at a minimum is participating in) a Ponzi scheme in Costa Palmas and is facing criminal charges." Am. Compl. ¶¶ 75, 77, 80, 84.

### B.    Claims and Counterclaims

#### 1.    Claims

DLR asserts four causes of action against all defendants:

Claim 1, for tortious interference with prospective business advantage, alleges that defendants "intentionally spread false information" to plaintiff's customers, "including claiming that DLR was running Costa Palmas as a 'Ponzi scheme' or involved in such a scheme," and was "facing criminal charges for such conduct." Am. Compl. ¶ 127. As a result, DLR alleges, it "has suffered economic harm in that Customers have declined to move forward with purchasing properties at Costa Palmas, which has resulted in the loss of millions of dollars." *Id*. ¶ 129.

Claim 2, for defamation, alleges that defendants "caused to be published numerous false and defamatory statements about Plaintiff and its business," that they acted with malice,[9] and that "[a]s a proximate result of Defendants' defamation, Plaintiff has lost out on business opportunities and thereby has suffered loss of income and earnings[.]" Am. Compl. ¶¶ 134, 144-46, 148.

Claim 3, for "injurious falsehood," asserts that "[t]o the extent any statements alleged are not 'of and concerning' DLR," they "nevertheless denigrate the quality of DLR's services by stating that Costa Palmas, of which DLR is the developer, is being run as a criminal Ponzi scheme." Am. Compl. ¶ 153. This language, plaintiff alleges, "calls into question DLR's services as a developer,

---

[9] With respect to common-law malice, DLR alleges that Anderson and Raizada are "aggrieved purchasers" who contracted with 5W PR "specifically to defame DLR." Am. Compl. ¶ 146.

indicating not only that DLR is incapable of successfully fulfilling its commitments to develop Costa Palmas but that DLR is actively allowing or complicit in the siphoning of moneys from the development project." *Id.* ¶ 156.

Claim 4, for civil conspiracy, alleges that all defendants "acted in coordination to commit" the torts alleged in Claims 1, 2, and 3. Am. Compl. ¶ 166.

### 2. Counterclaims

In their Counterclaims, Raizada and TRG allege that DLR and its affiliates ran a "fraudulent real estate scheme" in which they "duped unsuspecting buyers into paying tens of millions of dollars for luxury homes in Costa Palmas." Countercl. ¶ 1. DLR allegedly lied to customers about the "nature, costs, timing, and construction of their homes," while "using money or materials earmarked for a particular buyer's home to construct other homes or . . . for DLR's own purposes." *Id.* ¶ 2. When buyers "stood up to" DLR, it "threatened, intimidated, and extorted money and concessions from them by holding their homes hostage and threatening to take away valuable property rights." *Id.* ¶ 3.

With regard to Lot 25, counterclaimants allege that DLR made numerous false representations to induce them to enter into the Construction Agreement, including that their construction costs would be "fixed" and "all necessary construction contracts, materials, and labor" were "in place to complete construction of the home by September 2021." Countercl. ¶¶ 31-35. However, as of March 2022 ("6 months after DLR represented the home would be completed"), little work had been performed on the home, *id.* ¶ 40, and DLR – through Waller – threatened to keep counterclaimants' money, "hold the house hostage, and terminate [Raizada's] Beach Club membership" unless they signed the Estoppel Certificate, which represented – again, falsely – that the total cost for construction of the home was $7.2 million and that it would be "completed by the

end of 2022." *Id*. ¶¶ 42-43. TRG and Raizada signed the Estoppel Certificate in July 2022, borrowed more money to cover the construction costs, and paid DLR an additional $500,000, *id*. ¶¶ 44-45, only to be told, shortly thereafter, that the construction budget had ballooned to almost $11 million and that no further work would be done on the home unless they accepted that budget. *Id*. ¶ 49. When they responded by filing the Central District Action in January 2023, DLR retaliated by causing its affiliate to cancel their Beach Club membership and refusing to complete the home, *id*. ¶ 52, which – as of May 2024 – was still "nothing more than a concrete shell." *Id*. ¶ 54.

Raizada and TRG assert five counterclaims against DLR:

Counterclaim I, for fraudulent misrepresentation, alleges that DLR "intentionally made fraudulent representations to Counterclaim Plaintiffs to induce them to purchase [Lot 25] for $4,250,000, enter into a construction contract with Irongate and its affiliates, and make millions of dollars of payments to DLR, Irongate, or their affiliates." Countercl. ¶¶ 60-61. Thereafter, in July 2022, DLR made additional fraudulent representations in order to induce them to sign the Estoppel Certificate and pay DLR more money. *Id.* ¶¶ 62-64.

Counterclaim II, for negligent misrepresentation, alleges that DLR "negligently" made the same false representations described in Counterclaim I. Countercl. ¶¶ 71-81.

Counterclaim III, for fraudulent concealment, alleges that from March 1, 2020, to July 7, 2022, DLR "failed to disclose and/or concealed and suppressed material facts," thereby inducing counterclaimants to purchase Lot 25, enter into the Construction Agreement, sign the Estoppel Certificate, and pay "millions of dollars to DLR, Irongate or their affiliates." Countercl. ¶¶ 82-89.

Counterclaim IV, for intentional interference with contractual relations, alleges that DLR "intentionally directed, induced, or caused" Beach Club LLC to terminate Raizada's membership. Countercl. ¶¶ 90-97.

16

Counterclaim V, for violation of New York's anti-SLAPP statute, N.Y. Civ. Right Law (CRL) § 70-a, alleges that DLR brought this action "without any factual basis and with the knowledge that [its] allegations are in fact false," thereby "using the lever of litigation to silence Raizada's constitutionally protected speech and to harass and punish him for it." Countercl. ¶ 101.[10] Raizada asserts that his allegedly defamatory statements "are actually true," including that DLR and its affiliates "are operating Costa Palmas in a loose, Ponzi-scheme like way," *id.* ¶ 106(a), and "are actually the subject of ongoing criminal investigations by federal authorities, prosecutors, and Homeland Security Investigations." *Id.* ¶ 106(b). Raizada seeks attorney's fees (because DLR "brought this case without substantial basis in fact or law," *id.* ¶ 107); compensatory damages (because DLR "brought this case to harass, intimidate, punish, or maliciously inhibit free speech, petition, or association rights," *id.* ¶ 108); and punitive damages (because DLR "brought this case 'for the sole purpose' of harassing, intimidating, punishing or maliciously inhibiting free speech, petition, or association rights"). *Id.* ¶ 109.

---

[10] SLAPP stands for "strategic litigation against public participation." *See Bobulinski v. Tarlov*, 2024 WL 4893277, at *6 (S.D.N.Y. Nov. 26, 2024). CRL § 70-a permits a defendant in an action "involving public petition and participation" (typically, a defamation action seeking damages for defendant's statements made in a "public forum in connection with an issue of public interest," CRL § 76-a(1)(a)(1)) to "maintain an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued such action." CRL § 70-a(1). Attorney's fees are recoverable "upon a demonstration . . . that the action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law." CRL§ 70-a(1)(a). Compensatory damages are recoverable "upon an additional demonstration that the action . . . was commenced or continued for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights." CRL § 70-a(1)(b). Punitive damages are recoverable "upon an additional demonstration that the action . . . was commenced or continued for the sole purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights." CRL § 70-a(1)(c).

### C.    Motions to Compel Arbitration

#### 1.    Anderson's Motion

On March 11, 2024 – before plaintiff filed its Amended Complaint – Anderson moved to "compel arbitration of the Complaint" and "stay this action." Anderson Moving Mem. (Dkt. 44) at 5. Relying on the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the New York Convention), and its implementing legislation, found in Chapter 2 of the Federal Arbitration Act (FAA), 9 U.S.C. §§ 201-08, Anderson contends that all of plaintiff's claims "arise out of or relate to" the GS 1975 PSA, and therefore must be arbitrated before the ICC in Mexico. *Id*. at 10-11, 12-14. Anderson further contends that although he is not a signatory to the GS 1975 PSA in his personal capacity, he is entitled to enforce its arbitration clause "under the principle of equitable estoppel" because of his "close relationship" with GS 1975 and because DLR's claims against him are "intertwined" with the parties' obligations under the PSA. *Id*. at 12. He adds that any dispute as to the arbitrability of those claims "should be decided by the arbitrator" because the agreement provides for arbitration under the ICC Arbitration Rules, which delegate questions of arbitrability to the arbitrator. *Id*. at 14-15. Finally, Anderson urges the Court to stay all proceedings in this forum "until such arbitration has been had." *Id*. at 15 (quoting 9 U.S.C. § 3).

In its opposition memorandum, filed on April 15, 2024, DLR argues preliminarily that Anderson's motion to compel arbitration was mooted by the filing of its Amended Complaint that day. *See* Pl. Opp. (Dkt. 54) at 1 n.1. In any event, it contends, the Court cannot compel arbitration unless it has first determined "that personal jurisdiction over Anderson exists." *Id*. at 13.

Turning to the substance of the motion to compel, DLR points out that commercial arbitration agreements between United States and Mexican citizens are governed by the Inter-

American Convention on International Commercial Arbitration of January 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245 (the Panama Convention), and its implementing legislation, found in Chapter 3 of the FAA, 9 U.S.C. §§ 301-06. Pl. Opp. at 4 n.2 (citing 9 U.S.C. § 305).[11] It then argues that its claims against Anderson are not arbitrable because they "do not arise out of or relate to" either the GS 1975 PSA or the Amendment. *Id.* at 5. In plaintiff's view, its claims for defamation and related torts "exist independently of the PSA and the [A]mendment, and can be adjudicated without any needed interpretation of those agreements or either parties' [sic] performance thereunder[.]" *Id.* at 7. DLR further argues that Anderson is not entitled to compel "arbitration of arbitrability by a non-signatory" because the "plain text" of the arbitration clause itself makes it clear that only the "parties" – DLR and GS 1975 – are entitled to enforce it, Pl. Mem. at 9-10, and because, "[e]ven assuming a close relationship [between Anderson and his LLC], Anderson has not shown that the issues he seeks to compel to arbitration are 'intertwined' with the PSA or 'arise under' its subject matter." *Id.* at 11, 13.

In his reply brief, submitted on May 6, 2024, Anderson asserts – correctly – that the filing of the Amended Complaint did not moot his motion to compel arbitration,[12] and that courts in this

_____

[11] DLR is correct, but the point is inconsequential, because "[i]t has long been established . . . that the Panama Convention is substantively identical to the New York Convention and that authority interpreting one may be applied to the other." *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 62 n.2 (2d Cir. 2022); *see also* 9 U.S.C. § 302 (incorporating §§ 202-05 and 207 of the FAA "as if specifically set forth herein, except that for the purposes of this chapter 'the Convention' shall mean the Inter-American Convention"). Under both treaties, the court "may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. §§ 206, 303(a).

[12] As this Court previously explained, "[t]he filing of an amended complaint does not automatically moot a motion to compel arbitration." (Dkt. 48 ¶ 5.) *See also*, *e.g.*, *Poletti v. Pepsi-Cola Bottling Co. of N.Y., Inc.*, 2023 WL 5769498, at *2, *5 (S.D.N.Y. Sept. 6, 2023) (granting defendants' motion to compel arbitration six months after granting plaintiff's motion to amend complaint that was operative when motion to compel was filed). In this case, DLR's amendment added detail –

Circuit are free to "resolve a motion to compel arbitration prior to resolving a motion to dismiss for lack of personal jurisdiction." Anderson Reply (Dkt. 69) at 12 (quoting *Lewis v. ANSYS, Inc.*, 2021 WL 1199072, at *3 (S.D.N.Y. Mar. 30, 2021)).[13] He then argues that DLR's effort to divorce its defamation claims from the GS 1975 PSA is fruitless, because the allegedly defamatory statements "accuse DLR of fraud in connection with the PSA," such that determining their truth or falsehood "requires interpreting what DLR can lawfully do" under the terms of the contract containing the arbitration agreement. *Id.* at 6-7. Returning to his equitable estoppel argument, Anderson reiterates, under well-established Second Circuit precedent, in order to compel DLR to arbitrate with him, he need only show that he has a sufficient relationship with GS 1975 (which DLR does not dispute) and that the claims against him are intertwined with "the rights created under the [arbitration] agreement." *Id.* at 10-11 (quoting *Mackris v. O'Reilly*, 2019 WL 11000205, at *5 (S.D.N.Y. Mar. 6, 2019)).[14]

---

as well as a fourth cause of action, for civil conspiracy – but did not alter the substance of its allegations in any way material to the motion to compel arbitration.

[13] A motion to dismiss for lack of personal jurisdiction, like a motion to compel arbitration, presents a "threshold" issue that "ordinarily must precede merits determinations in dispositional order." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007). When presented with multiple "threshold grounds for denying audience to a case on the merits,'" however, a federal court has "leeway" to choose among them. *Id.* (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999), and holding that the district court properly ruled on a *forum non conveniens* motion before addressing subject matter jurisdiction). Thus, as Judge Nathan noted in *Lewis*, 2021 WL 1199072, at *3, a district court may grant a motion to compel arbitration notwithstanding the pendency of a motion to dismiss on jurisdictional grounds. *Accord Burch v. 1412 Lansdowne Operating, LLC*, 2021 WL 4443768, at *3 (E.D.N.Y. Sept. 29, 2021); *Boss Worldwide LLC v. Crabill*, 2020 WL 1243805, at *2 n.5 (S.D.N.Y. Mar. 16, 2020); *Trs. of Laundry, Dry Cleaning Workers & Allied Indus. Health Fund, Workers United v. FDR Servs. Corp. of New York*, 2019 WL 4081899, at *1 n.1 (S.D.N.Y. Aug. 28, 2019).

[14] As Anderson points out, *see* Anderson Reply Mem. at 10 & n.3, Irongate and its affiliates – all of them non-signatories to the GS 1975 PSA – successfully relied on the same equitable estoppel principle to compel arbitration of GS 1975's fraud claims against them in the California State Court Action. *See* Memorandum of Points and Authorities, *GS 1975 v. Grosfeld* (June 16, 2023), at 4-5 (arguing that the non-signatory defendants were "entitled to pursue an order compelling

2.    **DLR's Motion**

DLR asks this Court to compel Raizada and TRG to arbitrate all of their fraud and contract-based counterclaims pursuant to the Construction Agreement and the Estoppel Certificate or – in the alternative – to dismiss them under "the claim-splitting doctrine" because they mirror the claims brought by TRG in the Central District Action. Pl. Moving Mem. (Dkt. 77) at 1. In DLR's view, moreover, the Court should compel "arbitration of arbitrability," *id*. at 8, pointing to the incorporation of the ICC Arbitration Rules into the underlying contracts and fact that the Estoppel Certificate, by its terms, requires Raizada and TRG to arbitrate with CP Homes "and its affiliates." *Id*. at 8-13. DLR recognizes that Counterclaim V, brought under New York's anti-SLAPP statute, is "not implicated by the arbitration agreements and not barred by the claim-splitting doctrine," *id*. at 1, and argues instead that it should be dismissed pursuant to Rule 12(b)(6) because, as a matter of law, such a claim cannot be brought in federal court. *Id*. at 1, 24-25.

In response, counterclaimants readily concede that their first four counterclaims "fall within the broad arbitration language" of both the TRG PSA and the Construction Contract. Raizada Opp. (Dkt. 82) at 5.[15] However, they argue, DLR cannot ignore those arbitration clauses when it is a plaintiff and then enforce them when it is a counterclaim defendant. *Id*. In their view, "[e]ither all of DLR's claims and Counterclaims I-IV should be litigated here, or all of these claims must be arbitrated in Mexico." *Id*.; *see also id*. at 15 ("DLR cannot have it both ways."). Even if

---

arbitration, pursuant to the principal of equitable estoppel," because "the subject matter of Plaintiff's claims is intertwined with the [GS 1975] PSA and there is a close relationship between signatory DLR and the non-signatory Defendants").

[15] Presumably for strategic reasons, Raizada and TRG do not expressly concede that their counterclaims fall within the even broader arbitration language in the Estoppel Certificate. Neither, however, do they dispute the point.

DLR is not compelled to arbitrate its defamation claims, they urge, those claims "should be stayed" pending the outcome of the arbitration. *Id.* at 5, 15.

Although Raizada never formally moved to compel arbitration, he and TRG devote much of the rest of their brief to the argument that DLR must arbitrate its defamation claims against Raizada as well as against Anderson. Raizada Opp. at 6-12. Additionally, they flesh out their waiver argument, asserting that DLR waived its right to compel arbitration of the counterclaims by filing its defamation claims in this Court, by "vigorously opposing Anderson's motion to compel arbitration under identical contractual provisions," and by "engaging in extensive motion practice in this Court." *Id.* at 14-15. Finally (as relevant here), counterclaimants argue that their anti-SLAPP counterclaim should not be dismissed, noting that several recent cases have permitted CRL § 70-a claims to proceed in federal court, and arguing that these cases – rather than those cited by DLR – were correctly decided. *Id.* at 19-22. Counterclaimants acknowledge, however, that if plaintiff's defamation claims are compelled to arbitration, along with the first four counterclaims, Counterclaim V, "should be stayed pending the outcome of the arbitration." *Id.* at 22.

In its reply brief, filed on July 29, 2024, DLR argues that its refusal to arbitrate its own defamation claims (which it believes to be non-arbitrable) cannot constitute a waiver of its right to compel arbitration of the "legally and factually distinct counterclaims" filed by Raizada and TRG. Pl. Reply (Dkt. 84) at 4. Nor, plaintiff argues, did it wait too long to bring its motion to compel, which it filed just two months after the operative counterclaims were lodged on May 3, 2024, *id.* at 5, on the date prescribed by the Court.

## II.    LEGAL STANDARDS

### A.    The Panama Convention and the FAA

Because all of the arbitration agreements at issue here arise out of commercial relationships between U.S. and Mexican citizens, involving property in Mexico, they fall under the Panama Convention, *see* 9 U.S.C. §§ 202, 302, 305(1), and may be enforced in this Court pursuant to the FAA, *see* 9 U.S.C. § 307, which embodies "a strong federal policy favoring arbitration as an alternative means of dispute resolution." *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004) (quoting *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001)). That policy "applies with particular force in international disputes." *Id.* (quoting *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs.*, *Inc.,* 369 F.3d 645, 654 (2d Cir. 2004)). However, because arbitration is a creature of contract, the FAA "does not require parties to arbitrate when they have not agreed to do so." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989)).

### B.    Arbitrability

"The Second Circuit has established a two-part test for determining arbitrability of claims not involving federal statutes: (1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement."' *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002); *accord Hartford Accident & Indem. Co.*, 246 F.3d at 226. Here, the parties do not dispute the existence of valid arbitration agreements, contained in both PSAs, the Amendment, the Construction Agreement, and the Estoppel Certificate. Instead, Raizada and TRG resist DLR's motion on the ground that it waived its right to compel arbitration, while DLR resists Anderson's motion on two grounds: that

its defamation claims are not within the scope of the arbitration clause set forth in the GS 1975 PSA and incorporated into the Amendment; and that even if they were, Anderson – a non-signatory to those contracts – could not compel DLR to arbitrate with him.

As to each of these issues, "the burden lies with the party opposing arbitration to demonstrate that the agreement is 'inapplicable' to the dispute at hand." *Legal Recovery Assocs.*, 2023 WL 1382134, at *4 (quoting *Marcus v. Collins*, 2016 WL 8201629, at *7 (S.D.N.Y. Dec. 30, 2016)); *see also Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000) ("[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."). In order to determine whether that burden has been met, the court properly "considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (cleaned up); *see also Sanchez v. Clipper Realty, Inc.*, 638 F. Supp. 3d 357, 366 (S.D.N.Y. 2022) ("Courts routinely consider documents outside the pleadings when evaluating motions to compel arbitration[.]").

### C.    Waiver

It has long been the rule in this Circuit that federal law applies to the question whether a party has waived its right to arbitrate, even where the contract containing the arbitration agreement is otherwise governed by state or (as here) foreign law. *See*, *e.g.*, *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 130-31 (2d Cir. 1997) (*Distajo II*) (applying federal rather than state law to determine whether plaintiff waived its right to compel arbitration); *accord Weiss v. Am. Express Nat'l Bank*, 2020 WL 6807628, at *2 (S.D.N.Y. Nov. 18, 2020). Most recently, in *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), the Supreme Court "assume[d] without deciding" that the

lower federal courts were "right to do so." *Id*. at 417. Since *Morgan*, courts in this Circuit have continued to apply federal law to claims that the right to arbitration has been lost through waiver. *See*, *e.g.*, *Diaz-Roa v. Hermes L., P.C.*, 2024 WL 4866450, at *10 & n.6 (S.D.N.Y. Nov. 21, 2024) (applying federal rather than Texas law to compel arbitration over plaintiff's claim of waiver).

Under federal law, a waiver may be found if the party moving to compel arbitration "knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right." *Morgan*, 596 U.S. at 419; *accord Brown v. Peregrine Enterprises, Inc.*, 2023 WL 8800728, at *3 (2d Cir. Dec. 20, 2023) (summary order). In this Circuit – post-*Morgan* – the courts focus on two factors: (1) "the time elapsed from when litigation was commenced until the request for arbitration," and (2) "the amount of litigation to date, including motion practice and discovery[.]" *Diaz-Roa*, 2024 WL 4866450, at *10 (quoting *Brevard v. Credit Suisse*, 2024 WL 36991, at *8 (S.D.N.Y. Jan. 3, 2024)); *accord Poletti*, 2023 WL 5769498, at *4.[16] "In assessing the amount of litigation activity," courts properly "evaluate any motion practice in which the parties have engaged and the extent of discovery that the parties have exchanged." *Wortham v. Total Transportation Corp.*, 2024 WL 4449411, at *4 (E.D.N.Y. Oct. 2, 2024). "There is no bright-line rule, however, for determining when a party has waived its right to arbitration: the determination of waiver depends on the particular facts of each case." *Johnson v. Ensite USA, Inc.*, 2022 WL 463381, at *4 (S.D.N.Y. Feb. 15, 2022) (internal quotation marks omitted).

---

[16] In the past, the Second Circuit also asked whether the pre-motion conduct of the party seeking to compel arbitration caused prejudice to the opposing party. *See Brown*, 2023 WL 8800728, at *3 (citing *Carcich v. Rederi A/B Nordie*, 389 F.2d 692, 696 (2d Cir. 1968)). In *Morgan*, however, the Supreme Court "[s]tripped" the prejudice requirement from the waiver inquiry in Circuits where no comparable requirement is applied outside of the arbitration context, reasoning that "a court may not devise novel rules to favor arbitration over litigation." 596 U.S. at 418-19.

### D.    Scope

In cases brought under the New York or Panama Convention, the courts also apply federal law to determine whether the subject of the parties' dispute falls within the scope of their arbitration agreement. *See*, *e.g.*, *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 668 (2d Cir. 1997) (applying federal law, notwithstanding Italian choice-of-law provision in parties' contract, to determine whether appellants' claims "touch matters covered by the parties' . . . agreements" and are thus within "the scope of the arbitration agreement") (internal quotation marks and citation omitted); *Holzer v. Mondadori*, 2013 WL 1104269, at *11 (S.D.N.Y. Mar. 14, 2013) (applying federal rather than Dubai law to determine "the scope of issues that are arbitrable").

"Construction of an arbitration agreement is a matter of contract interpretation, and 'as with any other contract, the parties' intentions control.'" *Lloyd v. J.P. Morgan Chase & Co.*, 791 F.3d 265, 270 (2d Cir. 2015) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010)). Thus, "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute.*" *Granite Rock Co. v. Int'l Bhd. of Teamsters,* 561 U.S. 287, 297 (2010). Any "doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration[.]" *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC,* 645 F.3d 522, 526 (2d Cir. 2011). However, the presumption "should only be applied 'where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand.'" *Id.* (quoting *Granite Rock*, 561 U.S. at 301); *see also Lloyd*, 791 F.3d at 270 ("the presumption of arbitrability is a tool for resolving genuine ambiguity, not a bias in favor of arbitration").

### E.    Enforcement by Non-Signatory

It is somewhat less clear, in our Circuit, whether and when federal law applies to the question whether a non-signatory to the arbitration agreement can compel arbitration (or be

compelled to arbitrate). *See Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 661-63 (2d Cir. 2005) (holding that "American federal arbitration law" governs that question, despite Egyptian choice-of-law clause in agreement); *Campaniello Imports,* 117 F.3d at 668-69 (applying federal law, despite Italian choice-of-law clause in agreement, without discussion); *but see Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 50-51 (2d Cir. 2004) (holding that Swiss law applies, in accordance with choice-of-law clause in agreement).[17]

It is "well established," however, "that the application of federal arbitrability law, despite the presence of a choice-of-law provision designating application of another forum's laws, is appropriate in cases where neither party raised the choice-of-law issue." *Holzer*, 2013 WL 1104269, at *10 (applying federal law to determine whether non-signatory could "invoke the arbitration clauses" where plaintiffs "do not assert that Dubai law governs the issue"); *see also Doe v. Trump Corp.*, 6 F.4th 400, 412 (2d Cir. 2021) (affirming district court's reliance on federal common law to determine whether non-signatory could enforce arbitration clause whether neither party argued for the application of state law).

Here, although the underlying contracts contain Mexican choice-of-law clauses, no party seeks to apply Mexican law. The Court therefore relies on federal arbitrability law, under which there are "a number of common law principles of contract law that may allow non-signatories to

---

[17] The lower federal courts have frequently acknowledged the "rocky precedential landscape" on this point. *SSI (Beijing) Co. Ltd. v. Prosper Bus. Dev. Corp.*, 2020 WL 6323938, at *12 (S.D.N.Y. July 30, 2020) ("[D]istrict courts within our circuit have struggled to discern when to apply federal law to determine whether a nonsignatory to an arbitration agreement can compel arbitration (or be compelled to arbitrate), and when to apply the law chosen by the parties."), *adopted,* 2020 WL 5253515 (S.D.N.Y. Sept. 3, 2020); *see also FR 8 Singapore Pte. Ltd. v. Albacore Maritime Inc.,* 862, 754 F. Supp. 2d 628, 634 (S.D.N.Y. 2010) ("Where the choice of law in a Convention case is between the law specified by the choice-of-law clause and federal common law, Second Circuit precedent has been less than crystal clear."); *Storm LLC v. Telenor Mobile Commc'ns AS*, 2006 WL 3735657, at *8 n.4 (S.D.N.Y. Dec. 15, 2006) (noting "inconsistencies in Second Circuit case law on this issue").

enforce an arbitration agreement[.]" *Doe v. Trump*, 6 F.4th at 412 (quoting *Ross v. Am. Express Co.*, 478 F.3d 96, 99 (2d Cir. 2007)). "One of the common law theories recognized by the Second Circuit for allowing a non-signatory to enforce an arbitration agreement is equitable estoppel, pursuant to which the signatory will be estopped from avoiding 'arbitration with a non-signatory when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the stopped party has signed.'" *Lismore v. Societe Generale Energy Corp.*, 2012 WL 3577833, at *6 (S.D.N.Y. Aug. 17, 2012) (Nathan, J.) (quoting *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88 (2d Cir. 1999)).

Under the doctrine of equitable estoppel (sometimes called intertwined claims estoppel), a non-signatory may estop a signatory from refusing to arbitrate claims against it where: (1) "the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed" and (2) there is "a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute" with the non-signatory. *Reid v. Tandym Group LLC*, 697 F. Supp. 3d 62, 75-76 (S.D.N.Y. 2023) (quoting *Doe v. Trump Corp.*, 453 F. Supp. 3d 634, 640 (S.D.N.Y. 2020), *aff'd*, 6 F.4th 400 (2d Cir. 2021)); *accord Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 127 (2d Cir. 2010); *JLM Indus.*, 387 F.3d at 177-78.

The first part of the equitable estoppel inquiry "addresses factual 'intertwinedness,'" *Holzer*, 2013 WL 1104269, at *13. "Claims are intertwined 'where the merits of an issue between the parties [i]s bound up with a contract binding one party and containing an arbitration clause.'" *Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293, 298 (S.D.N.Y. 2005) (alteration in original) (quoting *JLM Indus.*, 387 F.3d at 177). The "intertwinedness" prong thus presents "effectively the same question" as whether the claims against the non-signatory "fall within the scope" of the

underlying arbitration clauses. *Holzer*, 2013 WL 1104269, at *12; *see also JLM Indus.,* 387 F.3d at 178 (finding claims against non-signatories "undeniably intertwined" with the relevant arbitration agreements where, as "already noted," the same claims were found to be within the scope of the arbitration clauses).

The second prong of the equitable estoppel inquiry asks whether there is "a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Doe v. Trump*, 6 F.4th at 413 (quoting *Ragone*, 595 F.3d at 127). Here, the courts look primarily at "the relationship between the non-signatory seeking to compel arbitration and the signatory in whose shoes the non-signatory seeks to stand." *Holzer*, 2013 WL 1104269, at *14. Most of the cases in which equitable estoppel is applied involve "subsidiaries, affiliates, agents, and other related business entities." *Ross*, 547 F.3d at 144. Additionally, estoppel has been applied where "the signatory seeking to avoid arbitration treated the other signatory and nonsignatory as interchangeable with respect to its rights and responsibilities under the relevant contract." *Doe v. Trump*, 6 F.4th at 413 (citing *Ragone*, 595 F.3d at 127-28); *see also Medidata Sol. Inc. v. Veeva Sys., Inc.*, 748 F. App'x 363, 366-67 (2d Cir. 2018) (applying equitable estoppel where non-signatory was a corporate affiliate of the signatory in whose shoes it sought to stand, and "*plaintiffs themselves* treated the signatory and non-signatory corporate affiliates as at least somewhat interchangeable with respect to the plaintiffs' rights and responsibilities under the relevant contract"); *Campaniello Imports,* 117 F.3d at 668-69 (applying equitable estoppel where non-signatory Filippini was the owner and disclosed agent of the signatory company, and all of his alleged misrepresentations to plaintiffs were made in that capacity).

F.    **Stay**

If the district court determines that all of the parties' claims must be arbitrated, and if a stay has been requested, the court must stay the action pending the outcome of the arbitration proceedings. *Smith v. Spizzirri*, 601 U.S. 472, 475-76 (2024) ("When a federal court finds that a dispute is subject to arbitration, and a party has requested a stay of the court proceeding pending arbitration, the court does not have discretion to dismiss the suit on the basis that all the claims are subject to arbitration."); *see also Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015) ("[T]he text, structure, and underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested.").

"[I]f the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987). In making that determination, the court properly considers "factors such as the desirability of avoiding piecemeal litigation and the degree to which the cases necessitate duplication of discovery or issue resolution." *Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 110 (S.D.N.Y. 2017) (quoting *Maritima de Ecologia, S.A. de C.V. v. Sealion Shipping Ltd.*, 2011 WL 1465744, at *5 (S.D.N.Y. Apr. 15, 2011)). "A discretionary stay is particularly appropriate where there is significant factual overlap between the remaining claims and the arbitrated claims." *Winter Invs., LLC v. Panzer*, 2015 WL 5052563, at *11 (S.D.N.Y. Aug. 27, 2015); *see also Argus Media Ltd. v. Tradition Fin. Servs. Inc.*, 2009 WL 5125113, at *3 (S.D.N.Y. Dec. 29, 2009) ("[N]umerous courts have held that where arbitrable and non-arbitrable claims arise out of the same set of facts, a stay usually is appropriate in the interest of judicial efficiency, because the arbitration may decide the same facts at issue in the

litigation.").[18] Additionally, broad stay orders are favored where "the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." *Genesco*, 815 F.2d at 856. Ultimately, "[t]he decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket." *Id.*

## III.    ANALYSIS

### A.    Whether Counterclaims I-IV Must be Arbitrated

DLR contends that the Construction Agreement and the Estoppel Certificate constitute valid agreements to arbitrate; that Counterclaims I-IV (for fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, and intentional interference with contractual relations) fall within the scope of those agreements; and that although DLR is not a signatory to either contract, it can "enforce the agreements against Raizada and TRG under the doctrine of equitable estoppel," Pl. Moving Mem. at 14, because Counterclaims I-IV "arise under the subject matter" of the underlying contracts and "there is a 'close relationship' between DLR [the non-signatory] and CP Homes [the signatory]." *Id*. at 14-15. TRG and Raizada offer no resistance to any element of DLR's analysis, and expressly concede that Counterclaims I-IV "fall within the broad arbitration language of both contracts." Raizada Opp. at 5. However, they contend that DLR "waived its right to compel arbitration in this case," *id*. at 12 – by filing its defamation-based claims in this Court in January 2024 and then waiting until July 2024 to move to compel arbitration of the Raizada/TRG counterclaims – such that it cannot now "have it both ways." *Id*. at 15.

---

[18] In such cases, "a stay is warranted in part because the prior litigation or arbitration is likely to have preclusive effect over some or all of the claims not subject to arbitration." *Winter Invs., LLC v. Panzer*, 2015 WL 5052563, at *11 (S.D.N.Y. Aug. 27, 2015); *see also Bear, Stearns & Co. v. 1109580 Ont., Inc.,* 409 F.3d 87, 91 (2d Cir. 2005) (discussing the circumstances under which "[a]n arbitration decision may effect collateral estoppel in a later litigation").

Whether a party has waived its right to arbitration by participating in litigation is a question for the Court. *See Meyer,* 868 F.3d at 81 (2d Cir. 2017) ("Because [plaintiff's] waiver argument is based on defendants' defense of this litigation in the district court, we conclude that is a question for the district court rather than an arbitrator."); *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 456 (2d Cir. 1995) (*Distajo I*) ("[W]here the waiver defense was based on prior litigation by the party seeking arbitration . . . the court should decide the issue of waiver[.]"). Waiver of a contractual right, including the right to arbitrate, "is not to be lightly inferred." *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir. 1995) (quoting *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir. 1985)); *see also Herrera v. Manna 2nd Ave. LLC*, 2022 WL 2819072, at *8 (S.D.N.Y. July 18, 2022) ("waiver should not be lightly presumed and must be based on a clear manifestation of intent to relinquish a contractual protection") (quoting *Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015)). "The party opposing the motion to compel arbitration bears the burden of showing waiver." *Diaz-Roa*, 2024 WL 4866450, at *10.

Counterclaimants have failed to meet their burden, because neither "the amount of time elapsed" before DLR moved to compel arbitration of the counterclaims nor "the amount of litigation" conducted during that period, *see Diaz-Roa*, 2024 WL 4866450, at *10, was so "inconsistent" with its current motion as to suggest that DLR "knowingly relinquish[ed]" its right to arbitrate those counterclaims. *Morgan*, 596 U.S. at 419. Raizada and TRG first lodged their counterclaims on January 31, 2024, when they answered DLR's original Complaint. (Dkt. 30.) For case management purposes (the other defendants having not yet answered or moved), DLR sought and obtained an extension of its time to respond to the counterclaims. (Dkt. 36.) After Anderson and 5W PR filed motions to dismiss, DLR sought and obtained leave to amend its complaint,

which – as the Court noted – gave Raizada and TRG "an opportunity to amend their counterclaim." (Dkt. 48 ¶ 4.) On April 15, 2024, DLR filed its Amended Complaint, and on May 3, 2024, Raizada and TRG answered it and reasserted their counterclaims. That same day, the Court directed the remaining defendants to respond to the Amended Complaint by June 5, 2024, and set July 8, 2024, as the uniform deadline for DLR to respond to "any motions, responsive pleadings, or counterclaims asserted or reasserted by all Defendants in response to the Amended Complaint," including the Raizada/TRG counterclaims. (Dkts. 66, 68.)

DLR timely filed its motion to compel arbitration of Counterclaims I-IV on July 8, 2024. Prior to that, it filed no answer, asserted no affirmative defenses, made no motions (other than its extension applications), sought no discovery, and did nothing else that could be characterized as "litigating" the Raizada/TRG counterclaims. On similar facts, courts in this District routinely reject waiver arguments. For example, in *Poletti*, defendants first invoked their right to arbitrate more than one year after plaintiffs filed their complaint. 2023 WL 5769498, at *2. During that year, plaintiffs amended their pleading twice, after which defendants moved to dismiss. *Id*. Plaintiffs then sought leave to amend a third time, and defendants opposed that motion. *Id*. Six months later, defendants moved to compel arbitration – while the motion for leave to amend was *sub judice* – and plaintiffs objected on waiver grounds. *Id*. at *4. The court declined to find a waiver, explaining that "although a one-year delay is not prompt," arbitration has frequently been compelled after even longer delays. *Id*.[19] Moreover, the court noted, the delay was attributable in part to plaintiffs'

---

[19] *See*, *e.g*., *Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002) (refusing to find waiver after a three-year delay where there was "no evidence of extensive discovery or substantive motions" in the interim); *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 122 (2d Cir. 1991) (no waiver even though defendant did not move to compel arbitration for three years, where "matters of estate administration, as well as a dispute over whether the trustee's counsel had a conflict of interest, contributed to and basically accounted for the three-year delay").

conduct in "amend[ing] their complaint twice"; the parties had "not yet begun discovery"; and defendants' prior motion practice was limited to "a motion to dismiss and the present motion to compel arbitration." *Id.*

Similarly, in *Bayron-Paz v. Wells Fargo Bank, N.A.*, 2023 WL 4399041 (S.D.N.Y. July 7, 2023), defendant Wells Fargo answered the complaint, consented to the filing of a first amended complaint, moved to dismiss it, consented to the filing of a second amended complaint, and then – approximately eight months after the case was filed – moved to compel arbitration. *Id.* at *2. The court rejected plaintiff's waiver argument and granted the motion to compel, reasoning that defendants "timely moved to compel arbitration" once the second amended complaint was on file, and noting that "no *significant* litigation . . . occurred in the intervening months." *Id.* at *5 (emphasis added).[20]

Here, as in *Poletti* and *Bayron-Paz*, the motion to compel arbitration was made promptly upon the filing of the opposing party's now-operative pleading. Moreover, unlike the defendants in *Poletti* and *Bayron-Paz*, DLR did not make *any* merits motions addressed to that pleading (or its predecessor), did not take *any* discovery, did not file an answer or assert any affirmative

---

[20] *See also*, *e.g.*, *Schatzmann v. Harris Partners Ltd.*, 2024 WL 1255296, at *10 (S.D.N.Y. Mar. 22, 2024) (rejecting waiver argument where defendant filed counterclaims and simultaneously moved to compel arbitration, seven months after complaint was filed, but where only "[m]inimal discovery" was exchanged, and "the case [was] still in its infancy"); *Fasano v. Li*, 2023 WL 6292579, at *10 (S.D.N.Y. Sept. 27, 2023) (rejecting waiver argument, even though six years passed before defendants moved to compel arbitration, because during those years there was "almost no litigation on the merits of this dispute, and the parties . . . engaged in virtually no discovery"); *De Jesus v. Gregorys Coffee Mgmt.*, LLC, 2022 WL 3097883, at *8-9 (E.D.N.Y. Aug. 4, 2022) (rejecting waiver argument where defendants waited eight months before moving to compel arbitration, in the meantime answering the complaint and engaging in document discovery, but taking no depositions); *Herrera*, 2022 WL 2819072, at *10 (rejecting waiver argument where one year elapsed before defendants sought leave to move to compel arbitration, but motion practice during that period "dealt primarily with procedural, non-substantive issues" and no "substantial discovery" occurred).

defenses, and did not otherwise conduct itself in a manner inconsistent with its present position that Counterclaims I-IV are arbitrable. Consequently, although six months passed between the filing of the original Raizada/TRG counterclaims and DLR's motion to compel arbitration of the amended Raizada/TRG counterclaims, I cannot conclude that DLR did anything during that period to "knowingly relinquish the right to arbitrate" the counterclaims. *Morgan*, 596 U.S. at 419.

Nor did DLR waive its right to arbitrate Counterclaims I-IV by filing its own defamation-based claims in this Court (or by resisting Anderson's efforts to compel arbitration of those claims). "[O]nly *prior* litigation of the *same legal and factual issues* as those the party now wants to arbitrate results in waiver of the right to arbitrate." *Distajo II*, 107 F.3d at 133 (emphases added) (holding that defendant's pursuit of eviction actions against various franchisees did not constitute a waiver of its right to arbitrate the franchisees' later claims alleging multiple violations of the franchise agreements and related torts). While there is considerable factual overlap between DLR's defamation claims and Raizada's fraud counterclaims, *see* Part III(B)(1), *infra*, they are not "identical," *id. at* 132, either legally or factually, and thus the fact that DLR seeks to litigate its own claims does not constitute a waiver of its right to arbitrate the counterclaims. *See Wagoner,* 944 F.2d at 122 (no waiver where prior litigation involved "legally distinct claims"); *accord Murray v. DCH Toyota City*, 2021 WL 1550074, at *4 (S.D.N.Y. Apr. 20, 2021); *Weiss*, 2020 WL 6807628, at *2.

Consequently, Raizada and TRG must arbitrate their first four counterclaims.

## B.    Whether DLR's Claims Must be Arbitrated

In its opposition to Anderson's motion to compel arbitration, DLR raises two issues: first, whether its defamation-based claims "arise out of or relate to" the underlying agreements between DLR and GS 1975, *see* Pl. Opp. at 5-7; and second, whether Anderson, a non-signatory to those

agreements, can compel arbitration thereunder. *See id.* at 8-13. Each of these issues, in turn, requires this Court to decide a predicate question: "whether arbitration of arbitrability is appropriate." *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 209 (2d Cir. 2005).

### 1.    Scope

"The question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *AT&T Techs., Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986)); *see also DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318-20 (2d Cir. 2021) ("'[T]hreshold questions of arbitrability,' such as whether the arbitration agreement applies to a particular dispute, 'presumptively should be resolved by the court and not referred to the arbitrator.'") (quoting *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250-51 (2d Cir. 2019)).

When determining whether the parties agreed to "arbitration of arbitrability," *Contec*, 398 F.3d at 209, courts in this Circuit consider (i) whether "the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes," *DDK Hotels,* 6 F.4th at 318–19; *see also Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019) ("Broad language expressing an intention to arbitrate all aspects of all disputes supports the inference of an intention to arbitrate arbitrability[.]"), and (ii) whether the parties have "explicitly incorporate[d] rules that empower an arbitrator to decide issues of arbitrability." *Contec*, 398 F.3d at 208. Where both factors are present, arbitration should be compelled, leaving any remaining questions of scope for the arbitrator. *See*, *e.g.*, *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 118, 120-23 (2d Cir. 2003) (broad arbitration clause, covering all disputes "concerning or arising out of this Agreement," coupled

with incorporation of ICC arbitration rules, constitute clear and unmistakable evidence of intent to arbitrate arbitrability).[21]

Here, both factors support the conclusion that the parties intended to submit arbitrability disputes to arbitration. They used classically broad language, requiring arbitration of any "controversy or claim arising out of or relating to this Agreement, or the breach thereof[.]" GS 1975 PSA ¶ 51. *See Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 113 (2d Cir. 2023) ("A broad clause is one that purports to refer to arbitration all disputes arising out of a contract, whereas a narrow clause limits arbitration to specific types of disputes.") (internal quotation marks and alterations omitted); *Collins & Aikman Prod. Co. v. Bldg. Sys., Inc*., 58 F.3d 16, 20 (2d Cir. 1995) (describing clause requiring arbitration of "any claim or controversy arising out of or relating to" the parties' agreement as a "paradigm of a broad clause"). Further, they incorporated the ICC Arbitration Rules, which delegate questions of arbitrability to the arbitrator or to the ICC's own governing body, known as the Court of Arbitration. *See* Riley Decl. Ex. 9 (Dkt. 78-9) Art. 6 § 3 ("[I]f any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement . . . , the arbitration shall proceed and any question of jurisdiction . . . shall be decided directly by the arbitral tribunal, unless the Secretary General refers the matter to the Court [of Arbitration] for its decision pursuant to

---

[21] *See also*, *e.g*., *Wexler v. LVNV Funding, LLC*, 2023 WL 4305776, at *11 (S.D.N.Y. June 30, 2023) (finding unmistakable evidence of parties' intent to delegate arbitrability to the arbitrator in their "broad agreement," which incorporated the AAA arbitration rules and provided for arbitration of "any claim, dispute or controversy between you and us arising out of or related to your Account . . . or our relationship"); *Reid*, 697 F. Supp. 3d at 77-78 (whether parties' agreement "authorizes class or collective arbitration" was a question for the arbitrator, not the court, where agreement contained "a broad arbitration clause, requiring the arbitration of 'any dispute, controversy or claim arising out of or related to this Agreement,'" and incorporated the AAA Commercial Arbitration Rules, which confer upon the arbitrator "the power to rule on his or her own jurisdiction").

Article 6(4).").[22] I therefore conclude that the GS 1975 PSA "clearly and unmistakably evidences the parties' intent to arbitrate questions of arbitrability." *Shaw*, 322 F.3d at 125.

In this case, however, the parties, have invited the Court to determine the threshold issue of scope.[23] I accept the invitation and conclude that plaintiff's defamation-based claims are within the scope of ¶ 51 of the GS 1975 PSA. I begin with the broad language in the parties' arbitration agreement, which is "significant" because it signals the parties' intent that "even collateral issues – that is, issues '*related to* but not facially covered by the arbitrable subject matter – should be arbitrated.'" *Dill v. JPMorgan Chase Bank, N.A.*, 2020 WL 4345755, at *6 (S.D.N.Y. July 29, 2020) (quoting *Ji Dong Cheng* v. *HSBC Bank USA, N.A.*, 467 F. Supp. 3d 46, 50 (E.D.N.Y. 2020)).[24]

---

[22] The Second Circuit has twice agreed that this rule gives the arbitrator the authority to determine arbitrability. *See Olin Holdings Ltd. v. State*, 73 F. 4th 92, 106 (2d Cir. 2023); *Shaw*, 322 F.3d at 124-25. Similarly, DLR itself argues – in support of its own motion to compel arbitration of the Raizada/TRG counterclaims – that the parties' contracts, "through the incorporation of the ICC Arbitration rules, 'clearly and unmistakably delegate[] the issue of arbitrability to the arbitrator[.]'" Pl. Moving Mem. at 9 (quoting *Republic of Kazakhstan v. Chapman*, 585 F. Supp. 3d 597, 607 (S.D.N.Y. 2022)).

[23] As noted above, DLR argues in its motion to compel arbitration of the Raizada/TRG counterclaims that the parties delegated all relevant issues of arbitrability to the arbitrator (including both the scope of the arbitration clause and whether that clause can be invoked by a non-signatory). Pl. Moving Mem. at 9-13. In its opposition to Anderson's motion, however, DLR conspicuously makes no such argument. Instead, it urges the Court to determine all questions of arbitrability itself and to find, as a matter of law, that its "claims for tortious interference with prospective business advantage, defamation, injurious falsehood, and civil conspiracy, all of which relate to the campaign orchestrated by 5W PR as the agent of Anderson and Raizada, do not arise out of or relate to either of the agreements." Pl. Opp. at 5. Anderson, for his part, contends that all relevant questions of arbitrability are for the arbitrator, but "in the interests of efficiency . . . invites this Court to resolve the arbitrability question now." Anderson Reply at 12.

[24] *See also* Mem. of Pts. and Auth. in Supp. of Defs' Mtn. to Compel Arb. and Stay Proceedings, at 8, *GS 1975 v. Grosfeld* (June 16, 2023) (Irongate, arguing in the California State Court Action that because the arbitration agreement in the GS 1975 PSA is "broad," Anderson's factual allegations "need only 'touch matters' covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability").

I next consider whether the "factual allegations undergirding . . . plaintiff's claims" raise issues that are "related to," *Dill*, 2020 WL 4345755, at *6, or "touch," *Campaniello Imports*, 117 F.3d at 668, "matters covered by" the parties' agreements. *Id.*; *see also*, *e.g.*, *Robinson Brog Leinwand Greene Genovese & Gluck P.C. v. John M. O'Quinn & Assocs., L.L.P.*, 523 F. App'x 761, 764 (2d Cir. 2013) (summary order) (broad arbitration provisions "encompass[] any disputes that touch matters covered by the contract in which the arbitration provision is found"); *Carroll v. Leboeuf, Lamb, Greene & MacRae, L.L.P.*, 374 F. Supp. 2d 375, 378 (S.D.N.Y. 2005) (Kaplan, J.) (noting the "well-accepted principle that even claims that merely 'touch matters' covered by agreements containing broad arbitration clauses must be arbitrated")

The factual allegations underlying DLR's claims "touch" the GS 1975 PSA in multiple ways. Plaintiff alleges that Anderson is a "disgruntled purchaser," *see* Am. Compl. ¶¶ 4, 38, whose unhappy experiences under those contracts – set out in some detail in the Amended Complaint, *see id*. ¶¶ 38-53 – undergird a necessary element of plaintiff's defamation claim: that he acted with "common law malice," meaning "spite, ill will, and animus toward Plaintiff." *Id*. ¶ 120. Notwithstanding plaintiff's more recent efforts to distance itself from these allegations, *see* Pl. Opp. at 12 (arguing that ¶¶ 38-53 are merely "background information"), it is difficult to imagine how DLR could prove that Anderson acted with malice without explaining the parties' contractual history to the trier of fact. Indeed, but for the GS 1975 PSA, Anderson would not have been a DLR customer at all, and would have had no reason to make any public statements about DLR or its affiliates. Thus, DLR's claims are "necessarily related to the [GS 1975 PSA] and the arbitration provision in that agreement applies." *Robinson Brog*, 523 F. App'x at 764 (dispute over apportionment of attorneys' fees was subject to arbitration clause in Client Agreement because "[w]ithout the Client Agreement, there are no clients to represent or attorneys' fees to recover");

*see also Dill,* 2020 WL 4345755, at *7 (dispute over bank's handling of cashier's checks was subject to arbitration clause in plaintiffs' Deposit Account Agreement because they purchased the checks "using funds" from their accounts, without which the case never would have arisen).

It is even more difficult to imagine how plaintiff could prove the falsity of the allegedly defamatory statements without litigating the parties' conduct under the GS 1975 PSA. In an effort to avoid arbitration, plaintiff isolates a handful of statements in the Defamatory Articles – specifically, that Costa Palmas is being operated as a "Ponzi scheme" and that DLR and its affiliates are under active "criminal investigation," *see* Am. Compl. ¶¶ 5, 67, 69, 71, 75, 77, 84, 88, 98, 127, 135, 141, 144, 153-57 – and argues that the truth of *these* statements, viewed in the abstract, "can be adjudicated without any needed interpretation of [the PSAs] or either parties' performance thereunder[.]" Pl. Opp. at 7. In making this argument, however, plaintiff undersells its own pleading, which is careful not to confine its claims so narrowly. *See*, *e.g*., Am. Compl. ¶ 84 ("[T]hese articles falsely convey, *amongst other things*, that DLR is operating (or complicit in) a 'Ponzi scheme,' at Costa Palmas, that Mexican and American Federal Officials are investigating DLR and Costa Palmas, and that DLR is facing criminal charges."); *id*. ¶ 127 ("Defendants intentionally spread false information to Customers, *including* claiming that DLR was running Costa Palmas as a 'Ponzi scheme' or involved in such a scheme, and under criminal investigation and facing criminal charges for such conduct.") (emphases added).

DLR has thus left itself free to claim that *other* public statements allegedly made by defendants are also actionable, including, for example, statements to the effect that Grosfeld and his companies fraudulently induced Anderson and others to enter into PSAs by making false promises they had no intention of keeping, and then extracted additional sums through hardball tactics such as threatening to default the buyers, stop construction work, and/or cancel their Beach

Club memberships.[25] These are, of course, the same claims that Anderson made in the California

State Court Action,[26] which Irongate successfully compelled to arbitration on the ground that they

"relate to and arise from the [GS 1975] PSA." Mem. of Pts. and Auth. in Supp. of Defs' Mtn. to

Compel Arb. and Stay Proceedings, at 11, *GS 1975 v. Grosfeld* (June 16, 2023).

Even if DLR strictly confined its current claims case to the "Ponzi scheme" and "criminal

investigation" statements, the former could not be separated from the parties' performance under

the GS 1975 PSA. The Defamatory Articles do not describe Costa Palmas as a "Ponzi scheme" in

the abstract.[27] Rather, they use that label to describe the specific claims of specific buyers –

Anderson and Raizada – that DLR and its affiliates improperly diverted their funds for purposes

other than building their homes.[28] Thus, "the subject statements involve the incidents that

---

[25] *See*, *e.g.*, Am. Compl. Ex. B, at ECF pp. 3-6 (reporting that "two homebuyers" accuse Grosfeld and his companies of "fraudulently inducing home buyers," including Anderson, "into paying Irongate and its affiliates tens of millions of dollars for construction of luxury homes that were not in fact completed," and "extorting additional payments for work that was not done, was already paid for, or was not approved," and that these complaints "may be only the tip of the iceberg"); *id.* Ex. C at ECF pp. 3-6 (reporting that "two Costa Palmas homebuyers" accuse Irongate of misleading clients by promising that "their homes would be constructed within 18 months," which did not happen, and then "threatened to declare contract defaults or stop all construction activity if the amounts owed were not paid" and "retaliated" against the homebuyers, when they "made an effort to defend themselves," by cancelling their Beach Club memberships, and that "there may be numerous additional Costa Palmas home buyers with similar claims or experiences"); *id.* Ex. D at ECF pp. 3-4 (reporting that Irongate "misled Anderson" at the outset of their relationship, "took a $5 million deposit" from him, "did not complete the home as promised," "demanded another $1.5 million before he could inspect the property," and then retaliated against him for suing by revoking his Beach Club membership).

[26] *See*, *e.g.*, Cal. State FAC ¶¶ 1-6, 31-33, 39-43, 48-50 (alleging that Grosfeld and his companies induced Anderson to purchase Casita-1 through "false promises," with "no intention" of completing the residence when promised; that they lied again, about "substantially" completing the home, in order to extract additional monies from him; and that after he sued, they retaliated against him by terminating his "valuable beach club membership").

[27] Some of them do not use that phrase at all. *See*, *e.g.*, Am. Compl. Exs. D, E.

[28] *See*, e.g., Am. Compl. Ex. B at ECF p. 3 (Irongate "us[es] the millions of dollars that it receives for luxury homes in a loosely structured Ponzi scheme to take or divert money from home buyers for Irongate's own personal profit"); *id.* Ex. C at ECF p. 2 (same); *id.* Ex. E at ECF p. 9 (Irongate

transpired as a result of the contractual relationships of the parties." *Pompano-Windy City Partners, Ltd. v. Bear, Stearns & Co.*, 698 F. Supp. 504, 511 (S.D.N.Y. 1988), bringing them "within the scope" of their arbitration clause and "require[ing] arbitration." *Id*. (compelling arbitration of defamation claims by investors against their broker-dealer, after broker-dealer allegedly "spread[] false rumors about the extent of plaintiff's losses and deficit").

In this case, the connection is even tighter. In order to demonstrate that the "Ponzi scheme" statements in the Defamatory Articles are false, DLR must prove – and has already pleaded – that "[n]o funds are diverted for improper purposes by DLR (or anyone) at Costa Palmas." Am. Compl. ¶ 100; *see also id*. ¶ 139 ("Any suggestion that funds from property sales [were] diverted for any improper purpose is baseless."); *id*. ¶ 157 (same). And in order to prove that no funds were "diverted" for "improper" purposes, it must show that whatever it did with the money that Anderson paid for Casita-1 was "proper," that is, authorized by the GS 1975 PSA.[29] Consequently, DLR cannot establish the falsity of the "Ponzi scheme" statements (and Anderson cannot defend them as truthful) without litigating the parties' performance under the GS 1975 PSA. This is more than enough to require DLR to arbitrate its new defamation claims along with Anderson's existing fraud claims (which present many of the same factual issues and are already before the ICC). *See*

---

and its affiliates have "allegedly diverted millions of dollars from buyers, intended for purchasing labor, goods, and materials for their homes, to other projects or for their gain"). I note again that Anderson made the same allegations in the California State Court Action, *see* Cal. State FAC ¶ 3 (Grosfeld and his companies "divert[ed] funds paid by Plaintiff for his home for purposes other than construction of that home"), where Irongate successfully compelled arbitration by arguing, among other things, that "[t]here is no litigating this case without heavy reference to the [GS 1975] PSA." Mem. of Pts. and Auth. in Supp. of Defs' Mtn. to Compel Arb. and Stay Proceedings, at 7, *GS 1975 v. Grosfeld* (June 16, 2023).

[29] This is presumably why DLR has affirmatively alleged that it was entitled under the GS 1975 PSA to keep the $6.8 million that Anderson paid thereunder, after terminating the PSA, as "liquidated damages." Am. Compl. ¶ 51.

*Kouromihelakis v. Hartford Fire Ins. Co.*, 48 F. Supp. 3d 175, 185 (D. Conn. 2014) (compelling arbitration of plaintiff's defamation claims against his former employer because plaintiff could not prove the relevant statements false without showing that he "did not forge a document" during his employment, bringing the dispute squarely within the scope of his agreement to arbitrate disputes "aris[ing] out of" the parties' business relationship); *accord Lewis*, 2021 WL 1199072, at *8; *Owoyemi v. JPMorgan Chase & Co.*, 2011 WL 13298364, at *4 (E.D.N.Y. May 5, 2011).

*Leadertex* – upon which DLR heavily relies, *see* Pl. Opp. at 5-6 – is not to the contrary. Leadertex initially sued Morganton, a fabric dyer, accusing it of defective dyeing and finishing work. *Leadertex*, 67 F.3d at 23. After Morganton counterclaimed for unpaid dyeing charges, Leadertex added a defamation claim (against Morganton and unnamed "Doe" defendants), alleging that they falsely told a Leadertex customer that Leadertex was "dishonest in their conduct of business, incompetent and incapable to supply manufacturers with goods conforming in color and quality with that requested by its customers," that it "is in practice of selling goods defective in quality," and that it "willingly and with intent to defraud [the customer] shipped them defective, non-conforming goods." *Id*.

The Second Circuit affirmed the district court's denial of Morganton's motion to compel arbitration on waiver grounds. *Leadertex*, 67 F.3d at 25-26. Separately, it concluded that the defamation claims "fall[] outside the scope of the written arbitration clause in the [parties'] contract," *id*. at 27, because *each* of the four allegedly defamatory statements "implicates matters beyond the contractual performance of the parties," and *none* of the statements was "about the contract between Morganton and Leadertex, which set forth only their agreement for Morganton to provide dyeing and warehousing services to Leadertex." *Id.* at 28. Here, by contrast, *all* of defendants' allegedly defamatory statements (with the possible exception of the those concerning

the existence of an active criminal investigation) are, in one way or another "about the contract" between DLR and its "disgruntled purchaser," and are therefore arbitrable. *See also Buchman v. Weiss*, 2009 WL 2044615, at *6 (S.D.N.Y. July 15, 2009) (Sullivan, J.) (noting that the defamation claims in *Leadertex* were "based on statements not relating to the subject matter of the contract between the parties," and compelling arbitration of defamation claims that "go directly to the subject matter of the contract," namely, "the partnership between the parties and the duties created as a result").

In the event an arbitration agreement is "'ambiguous about whether it covers the dispute at hand,'" the court may apply a "'presumption of arbitrability.'" *Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 113 (2d Cir. 2023) (quoting *Granite Rock*, 561 U.S. at 301). I do not find the arbitration agreement contained in the GS 1975 PSA to be ambiguous as to scope. Were there any such ambiguity, however, it would properly be resolved in favor of arbitration.

### 2.    Non-Signatory

As noted above, the parties to the GS 1975 PSA entered into a broad arbitration clause and incorporated the ICC Arbitration Rules, which delegate questions of arbitrability to the arbitrator. However, where a *non-signatory* to the arbitration agreement seeks to compel arbitration, the predicate question – that is, whether the parties clearly and unmistakably agreed to arbitrate this aspect of arbitrability – requires the Court to consider not only these factors, but also whether the language of the arbitration agreement itself "clearly vest[s] any right to invoke arbitration in a non-party." *Republic of Iraq v. BNP Paribas USA*, 472 F. App'x 11, 12-13 (2d Cir. 2012) (summary order) (noting that "evidence of intent to have an arbitrator determine its jurisdiction with regard to disputes 'referred by either Party,' does not clearly and unmistakably demonstrate their intent to

have the arbitrator determine its jurisdiction with respect to any dispute raised by a *non-party*") (record citation omitted); *accord Holzer*, 2013 WL 1104269, at *8 ("when a non-signatory moves to compel arbitration of arbitrability, the language of the arbitration clause itself may clarify whether the parties in fact intended to delegate that threshold question to the arbitrator.")

According to DLR, the language of the arbitration clause at issue, "by its plain text, is limited to the parties to the agreement," Pl. Opp. at 9, because it provides that "[e]ither party may initiate arbitration" by giving notice to the "other party," GS 1975 PSA ¶ 51, and thus "do[es] not clearly allow for arbitration to be initiated by non-parties." Pl. Opp. at 10. Consequently, in DLR's view, the question whether Anderson can compel arbitration must be decided by the Court. *Id*. Anderson retorts that the PSA uses the defined and *capitalized* terms "Party" and "Parties" to refer to the Seller and the Buyer, *see* GS 1975 PSA at 1, whereas the arbitration clause uses the *non-capitalized* terms "party" and "parties" to refer to those entitled to initiate arbitration. Anderson Reply at 13. In Anderson's view, "[t]he plain meaning of the arbitration agreement's use of the undefined terms 'party' and 'parties' is to denote potential parties to an arbitration, and not the 'Parties' to the PSA." *Id*.

The Court is not entirely convinced, particularly given that the arbitration agreement bears some evidence of hasty proof-reading, making it difficult to determine what, if anything, the Seller and the Buyer intended to signify by using uncapitalized terms in a particular paragraph.[30] I therefore find the arbitration agreement ambiguous as to whether the Parties (to the PSA) intended to delegate the question of arbitrability by non-signatories to the arbitrator. Moreover, after *Granite Rock*, there is no presumption of arbitrability applicable here. *See Loc. Union 97*, 67 F.4th at 113

---

[30] Among other things, the arbitration agreement calls for the party initiating arbitration to give the other party a written notice of intent "in according to the herein established." GS 1975 PSA ¶ 51.

("*Granite Rock* stands for the proposition that courts may invoke a presumption of arbitrability only where the parties' dispute concerns a valid and enforceable agreement to arbitrate that is ambiguous *as to its scope*.") (emphasis added). Consequently, DLR is correct that the question whether Anderson (as a non-signatory) can compel arbitration "must be decided by the Court." Pl. Opp. at 10.

I answer that question in the affirmative. Anderson argues that he is entitled to compel arbitration of DLR's claims against him "under the principle of equitable estoppel." Anderson Moving Mem. at 12. He also argues – correctly – that "this is not a high bar," Anderson Reply at 10, requiring only a relatively uncomplicated "two-part inquiry," *Holzer*, 2013 WL 1104269, at *12, which asks (1) whether "the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed" and (2) whether there is "a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute" with the non-signatory. *Reid*, 697 F. Supp. 3d at 75-76.

Because the first inquiry is "effectively the same question" as whether the claims at issue "fall within the scope of" the PSA, *Holzer*, 2013 WL 1104269, at *12, I need not revisit it here. For all of the reasons set forth in Part III(B)(1), *supra*, I conclude that the claims Anderson seeks to arbitrate are deeply "intertwined" with the GS 1975 PSA.

As for the second inquiry, DLR has effectively conceded the "close relationship" between GS 1975, which is the Buyer under the contract containing the arbitration agreement, and Anderson, who – as its "principal and managing member," Anderson Decl. ¶ 2 – acted as its sole disclosed agent. Anderson negotiated the GS 1975 PSA (and the Amendment) with DLR; signed those contracts on behalf of the Buyer; performed the Buyer's contractual obligations, and asserted

the Buyer's contractual rights. Moreover, throughout the course of the parties' relationship, DLR has treated Anderson and his LLC, interchangeably, as the "purchaser" of Casita-1. *See* Am. Comp. ¶¶ 4, 38, 146, 160. I conclude that the relationship between Anderson ("the non-signatory seeking to compel arbitration," *Holzer*, 2013 WL 1104269, at *14) and GS 1975 ("the signatory in whose shoes the non-signatory seeks to stand," *id.*) is more than sufficient to estop DLR from "denying an obligation to arbitrate" with Anderson. *Doe v. Trump*, 6 F.4th at 413.

Consequently, DLR must arbitrate its defamation claims against Anderson.

### C.    Whether the Parties' Remaining Claims Should be Stayed

Anderson also asks that the remainder of this action be stayed. Anderson Moving Mem. at 5. Raizada concurs, arguing that if Counterclaims I-IV are subject to arbitration (which they are), all of DLR's claims should also be arbitrated, or "[a]t the very least . . . stayed pending the outcome of arbitration." Raizada Opp. at 5. 5W PR has neither affirmatively requested a stay nor opposed Anderson's motion. DLR, however, appears to take the position that, although Counterclaim V cannot be compelled to arbitration, it should be dismissed outright, pursuant to Rule 12(b)(6), because CRL § 70-a counterclaims are "inapplicable in Federal Court." Pl. Reply at 9-10.

After considering all of the relevant factors, including the "significant factual overlap" between the claims that must be arbitrated and those potentially remaining for litigation, *Winter Invs.*, 2015 WL 5052563, at *11, I conclude that a stay of the entire action is appropriate. DLR's claims against Raizada and 5W PR are identical to its claims against Anderson, which must be arbitrated. Not only does plaintiff assert the same torts, based on the same facts, against all three defendants; it alleges that they "engaged in a conspiracy to commit the alleged tortious conduct." Am. Compl. ¶ 14. Thus, the arbitration of DLR's claims against Anderson (and Raizada, should either DLR or Raizada move those claims to the arbitral forum) will necessarily resolve most of

the issues underlying its claims against 5W PR.[31] On the other hand, "a failure to extend a stay against the remaining defendants would result in duplicative discovery and create the possibility of inconsistent outcomes." *Hughes, Hooker & Co. & Hughes, Hooker (Correspondents) S.A. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc.*, 2005 WL 1384055, at *6 (S.D.N.Y. June 9, 2005) (compelling arbitration of plaintiffs' claims against one defendant and staying its related claims against the remaining defendants to "further the interests of judicial economy and fairness"). Moreover, DLR – which did not brief this issue – has not shown any interest in prosecuting the same defamation claims in two jurisdictions simultaneously, nor identified any prejudice that it would suffer as a result of a case-wide stay.

Counterclaim V, asserted under New York's anti-SLAPP statute, also overlaps significantly with Anderson's defamation and defamation-adjacent claims, which must be arbitrated. Indeed, the defamation claim and the anti-SLAPP counterclaim are – from a factual standpoint – mirror images of one another.[32] Thus, a win for DLR on its claims in arbitration, if given preclusive effect,

---

[31] 5W PR's Chief Financial Officer asserts that the firm was not retained by Anderson and Raizada until November 1, 2023, did not commence work until December 2023, and "was not involved in, and in no way contributed to the contents of, the publication of any article referenced in the First Amended Complaint[.]" Declaration of John Ferrari (Dkt. 72) ¶¶ 2-3. This issue is specific to 5W PR. However, it is well-settled that a district court may stay non-arbitrable claims based in their factual "overlap" with the claims to be arbitrated. *Winter Invs.*, 2015 WL 5052563, at *11. Complete identity of factual issues rarely exists, and is not required. *See, e.g.*, *BSG Res. (Guinea) Ltd. v. Soros*, 2017 WL 5897450, at *4 (S.D.N.Y. Nov. 29, 2017) (staying entire case where "[t]he determination of key issues in the Arbitration . . . will have some bearing on all of Plaintiffs' claims in this action").

[32] This is so because, as to each defamatory statement identified by DLR, plaintiff necessarily alleges that it is false, while Raizada necessarily alleges that it is true. *Compare, e.g.*, Am. Compl. ¶ 139 ("As to the claim that Costa Palmas is a 'Ponzi scheme,' the statements were false," and "[a]ny suggestion that funds from property sales are diverted for any improper purpose is baseless") with Raizada Countercl. ¶ 106(a) ("DLR, Irongate, and their affiliates are operating Costa Palmas in a loose, Ponzi-scheme like way," including by "using money from new buyers to pay for labor, materials and supplies to complete other people's homes, or to satisfy DLR's other or prior obligations").

would be dispositive of the anti-SLAPP counterclaim, which requires Raizada to demonstrate – at a minimum – that DLR's claims were "commenced or continued without a substantial basis in fact and law." CRL§ 70-a(1)(a). Once again, therefore, a stay will preserve both judicial and party resources, guard against duplicative discovery (as well as the improper use of discovery devices available only in this Court to obtain discovery for use in the Mexican Arbitration), and "avoid[] possible inconsistent results." *Spurlock v. Thomson Reuters Am. Corp.*, 2022 WL 604066, at *6 (S.D.N.Y. Mar. 1, 2022) (staying plaintiffs' non-arbitrable copyright claims pending the arbitration of similar claims brought by plaintiffs and others against different defendants before the AAA, after determining that at any relief plaintiffs "may be entitled to in this action would necessarily depend, at least partially, on the resolution of [their] claims in the Arbitration"). If and to the extent Counterclaim V is "of questionable merit," as DLR contends, that factor also militates in favor of a stay. *Genesco*, 815 F.2d at 856.[33]

Consequently, this action will be stayed, in its entirety, pending arbitration.

---

[33] DLR argues – without any authority – that a stay of Counterclaim V is "unnecessary" because it is "easily dismissed." Pl. Moving Mem. at 19. According to DLR, "Courts in this District have repeatedly recognized that claims under Section 70-a cannot apply in Federal Court as a matter of law." *Id.* at 24. In fact, the district courts are in "conflict" on this issue. *Suffolk Cnty. Police Benevolent Ass'n v. Trotta*, 2024 WL 3443490, at *5 (E.D.N.Y. July 17, 2024) (collecting cases). In *Carroll v. Trump*, Judge Kaplan denied the defendant's motion for leave to amend his answer to assert an anti-SLAPP counterclaim, reasoning that § 70-a is "inapplicable in federal court" because its "'substantial basis' standard . . . conflicts with the standards under Federal Rules of Civil Procedure 12 and 56." 590 F. Supp. 3d 575, 585 (S.D.N.Y. 2022) (quoting *Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 430–32 (S.D.N.Y. 2021)). Last month, however, Judge Oetken disagreed, holding that to the extent CLR § 70-a(1)(a) operates as a fee-shifting provision (in favor of a prevailing defendant who can show that the failed defamation claim against him lacked "a substantial basis in fact and law"), the "operative rule" is substantive rather than procedural, *Bobulinski*, 2024 WL 4893277, at *12-14, and "applies in federal court." *Id.* at *16. The Second Circuit has not yet considered the question.

## IV.    CONCLUSION

For the reasons set forth above, the motion of defendant Anderson to compel arbitration of plaintiff's claims against him (Dkt. 43) is GRANTED, as is the motion of plaintiff DLR to compel arbitration of Counterclaims I-IV (Dkt. 76). Plaintiff's claims against defendants Raizada and 5W PR are STAYED pending the arbitration, as is Counterclaim V. The motions to dismiss filed by Anderson and 5W PR (Dkts. 71, 74) are administratively DENIED without prejudice to renewal when the arbitration is concluded. The parties must file a joint status letter no later than **June 20, 2025**, and every six months thereafter, updating the Court as to the progress of the arbitration proceedings.

The Clerk of Court is respectfully directed to terminate the motions at Dkts. 43, 71, 74, and 76.

Dated:  New York, New York
        December 20, 2024                    **SO ORDERED.**

_____
**BARBARA MOSES**
**United States Magistrate Judge**